C. W. Caywood and Cathryn B. Caywood v. Commissioner.
Caywood v. Commissioner
Docket No. 51329.
United States Tax Court
T.C. Memo 1958-131; 1958 Tax Ct. Memo LEXIS 97; 17 T.C.M. (CCH) 685; T.C.M. (RIA) 58131; July 9, 1958
Lawrence P. D'Antonio, Esq., and M. V. Morales, Jr., Esq., for the petitioners. J. Earl Gardner, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in petitioners' income tax: Additions to Tax
Taxable
Sec.
Sec.
Year Ending
Deficiency
293(b)
294(d)
Feb. 28, 1949
$ 7,174.46
$3,587.23
$1,184.00
Feb. 28, 1950
4,720.46
2,360.23
933.17
Feb. 28, 1951
16,586.82
8,293.41
3,094.03
Controversies *98 relating to some of the items taken into account by respondent in computing the deficiencies have been disposed of by stipulations and concessions. The general questions in the present case call for decision as to whether petitioners failed to report all of their income; if they did so fail, whether their failure was fraudulent; whether they are entitled to certain deductions; and whether the statute of limitations has run for any of the three taxable years in issue. Whenever feasible the findings have been grouped under the heading of the particular taxable year to which they pertain. Findings of Fact Some of the facts were stipulated and are incorporated herein by this reference. Petitioners, C. W. Caywood (hereinafter sometimes referred to as Caywood) and his wife Cathryn B. Caywood (hereinafter sometimes referred to as Cathryn), reside in Phoenix, Arizona. They filed timely joint income tax returns for the fiscal years ending February 28, 1949-1951, inclusive, with the director of internal revenue for the district of Arizona. With respect to the year ending February 28, 1951, they filed a return on March 28, 1951; thereafter, on May 14, 1951, they filed another, or so-called *99 "corrected", return for the same year. Respondent's notice of the deficiencies for the three taxable years in question was mailed on September 18, 1953. During 1948 Caywood was the field secretary to a United States Senator from Arizona. While so employed Caywood received his salary on a monthly basis. Sometime in January 1949 Caywood became Assistant Superintendent of Public Instruction for the State of Arizona. He occupied this position for approximately two years. During this two-year period he received his salary on a semi-monthly basis. On January 18, 1954 Caywood and Harry Tompkins (hereinafter referred to as Tompkins) were indicted in the United States District Court for the District of Arizona by a grand jury for that district. The indictment [1] contained, among others, the following paragraph: "That from on or about April 20, 1949, to and including the date of this indictment, within the State and District of Arizona, C. W. CAYWOOD, and HARRY TOMPKINS defendants herein, did knowingly, wilfully, unlawfully and feloniously conspire, confederate and agree together (1) to commit offenses against the United States of America, and (2) to defraud the United States of America *100 and certain agencies thereof, in that said defendants conspired to violate 18 U.S.C.A. section 1001, by knowingly and wilfully falsifying, concealing and covering up by tricks, schemes and devices, material facts, making and causing to be made false and fraudulent statements and representations in matters within the jurisdiction of departments and agencies of the United States of America, to-wit: The Department of the Army of the United States, the Department of the Navy of the United States, the War Assets Administration, the Surplus property Board of the United States, the Federal Security Agency, Office of Education of the United States, operating and functioning in the disposal of donable surplus property of the United States pursuant to the Surplus Property Act of 1944, as amended (Public Law 457 - 78th Congress, 58 Stat. 765, 50 U.S.C.A. app. 1611, et seq.), Public Law 862, 80th Congress (62 Stat. 1202 - 50 U.S.C.A. App. 1614(a)(b)), Public Law 889 - 80th Congress (62 Sta. 1233), the Federal Property and Administrative Services Act of 1949 - Public Law 152, 81st Congress (63 Stat. 377), and the regulations duly *101 promulgated thereunder, which falsifications, concealments, and coverings up by tricks, schemes and devices, were as follows, towit: That with respect to donable surplus property allocable to the Arizona State Department of Public Instruction and applied for by it as the duly designated Arizona state agency for surplus property for distribution to educational institutions in said State of Arizona, the said defendants made and executed false statements and representations to the effect that the property applied for, if allocated, would be dstributed "to eligible educational institutions for educational purposes on the basis of need and utilization" in said State of Arizona, whereas, as the said defendants then and there well knew, it was not intended that such property would be distributed to educational institutions in the State of Arizona, but would be, by the defendants, converted, diverted, and sold to persons and institutions not qualified to receive the same;" *102 * * *
Caywood and Tompkins were subsequently convicted. Taxable year ending February 28, 1949. On or about January 1, 1948 the Pima Syndicate was formed for purposes of buying and selling war surplus property located at the Marana Air Base in Arizona. Caywood was instrumental in obtaining credit for this enterprise and shared in its profits. He did not want his connection with the enterprise to be given publicity. A lawyer and business associate of Caywood, John A. Murphy, agreed to deposit certain payments from the Pima Syndicate in his law firm's bank account. Also, he agreed to make these deposits available to Caywood by drawing checks on that account. C. H. Robertson (hereinafter referred to as Robertson) was a member of the Pima Syndicate and he transacted most of the firm's business. Robertson filed the 1948 income tax return for the Pima Syndicate on a Form 1065 - a "Partnership Return of Income". The following material is from that return: Schedule I. - PARTNERS' SHARES OF INCOME AND CREDITS.
Name and address
Ordinary
of each partner
Net Income
(a) Kemper Marley
Phoenix, Arizona
$ 4,000
(b) C. H. Robertson
Florence, Arizona
3,000
(c) Jack Murphy
Title & Trust Bldg. - Phoenix, Ariz.
7,000
(d) George Locke
Luhrs Tower Bldg. - Phoenix, Ariz.
4,500
(e) Charles Aufferth Jr.
1306 So. Beverly Glen Blvd. - Los An-
geles, Calif.
1,500
Totals
$20,000
*103 By "Jack Murphy" Robertson had reference to John A. Murphy. John A. Murphy was not a partner or a member of the Pima Syndicate. His name was listed on the syndicate's income tax return without his knowledge. He did not learn of such listing until after the return was filed. On their income tax return for the taxable year ending February 28, 1949, petitioners reported $5,500 income from the Pima Syndicate. By a check dated April 28, 1948 in the face amount of $3,300, drawn to Cathryn's order, Robertson repaid a loan of $3,000 which Cathryn had made to him at an earlier date. The difference between the amount of the loan and the amount repaid was not reported on petitioners' income tax returns. Respondent included this amount, $300, in petitioners' income. The $300 was interest on the loan. In July 1948 the Santa Rita Investment Company, Inc. (hereinafter referred to as Santa Rita) was organized under the laws of Arizona. During that month Santa Rita issued a certificate dated July 2, 1948, representing six shares of its stock, to Caywood. Each share had a par value of $1,000. At all times relevant to this proceeding Caywood, Pete Waggoner, John A. Murphy and D. M. Bassett *104 each owned one-quarter of the outstanding stock of Santa Rita. At the time the certificate was issued to Caywood the stock of Santa Rita had no market value. On or about July 1, 1948 Caywood, Pete Waggoner, John A. Murphy and D. M. Bassett formed a partnership known as the Pioneer Sales Company (hereinafter referred to as Pioneer). This partnership was formed for purposes of buying and selling war surplus property. On November 26, 1948, Pioneer paid Caywood $200 in connection with a war surplus motor vehicle obtained by the partnership through his efforts. Petitioners' income tax return does not reflect this receipt. Respondent included the $200 in petitioners' income. This amount was income to petitioners. During 1948 Robertson acquired two war surplus motor vehicles through the efforts of Caywood. Robertson paid Caywood $250 in connection with one vehicle and $300 in connection with the other. These were the only amounts paid by Robertson to acquire the vehicles. Petitioners' income tax return does not reflect the payments received from Robertson. Respondent included the full amount of these payments, $550, in petitioners' income. This amount was income to petitioners. During *105 1948 Irvine W. Watts (hereinafter referred to as Watts) was an officer in the Civilian Air Patrol (hereinafter referred to as the C.A.P.). He was authorized to sell certain property belonging to that organization. In 1948 Caywood was a member of the C.A.P. At various times Caywood used airplanes owned by the C.A.P. for transportation in connection with his personal business. Caywood paid part of the fuel costs for these trips. Sometime in 1948 Watts informed Caywood that the C.A.P. had a tractor it wanted to sell. Subsequently an associate of Caywood, Bruce Smith, entered into a transaction with W. N. Shawver wherein the latter drew a check dated December 18, 1948, in the face amount of $1,500 to the order of Caywood. W. N. Shawver acted on behalf of Shawver Brothers, a firm engaged in land leveling and tillage operations. W. N. Shawver gave the $1,500 check to Bruce Smith and, thereafter, Shawver Brothers came into possession of the abovementioned tractor. The $1,500 check was delivered to Caywood and he, in turn, drew two personal checks, numbered 133 and 134 and dated December 22, 1948, in the total face amount of $1,000 to the order of Watts. Watts received the two checks dated *106 December 22, 1948, in full payment for the tractor, and he was unaware that Caywood had received an amount greater than $1,000 in connection with the tractor transaction. The transaction entailed the transportation of the tractor from Kingman Air Base in Arizona to W. N. Shawver's farm in that state with a stop on the way at Sky Harbor Airport in Phoenix - a total distance of approximately 300 miles. The tractor transaction was not reflected on petitioners' income tax returns. Respondent originally included in petitioners' income the $1,500 received by Caywood. Respondent now seeks to include in petitioners' income only the difference between the amount received by Caywood and the amount he paid to Watts. Caywood paid Bruce Smith $100 by a personal check numbered 135 dated December 22, 1948. This payment was Bruce Smith's commission on the sale. Petitioners received $400 of unreported income as a result of this transaction.
Petitioners had commercial accounts at the Coolidge, Arizona branch of the Valley National Bank of Phoenix, and at the home office of that bank in Phoenix, Arizona. (The Coolidge branch will hereinafter be referred to as the Coolidge bank.) They had savings *107 accounts at the home office of the Valley National Bank and at the Bank of Douglas in Phoenix, Arizona. Respondent determined that certain entries on deposit slips for petitioners' bank accounts represent income which petitioners failed to report on their income tax returns. Respondent included the sum of these items in petitioners' income. The items still at issue follow: Amount
Date
Check
$ 314.92
Apr. 28, 1948
Check
500.00
June 19, 1948
Check
500.00
July 31, 1948
Check
625.00
July 31, 1948
Check
1,000.00
Aug. 23, 1948
Check
800.00
Sept. 14, 1948
Check
500.00
Sept. 14, 1948
Check
405.00
Nov. 8, 1948
Currency
270.00
May 14, 1948
Currency
100.00
May 22, 1948
Currency
200.00
Sept. 14, 1948
The records of the Coolidge bank indicate that on August 10, 1948, two $500 items were charged against the balance in petitioners' account. The $1,000 entry listed above alongside the date August 23, 1948, had its source in the two $500 transactions of August 10, 1948. This money is accounted for on petitioners' income tax returns. During 1948 petitioners filled out deposit slips for their bank accounts in connection with the following *108 checks received by Caywood from the Government of the United States: Date on
Deposit Slip
Check No.
Amount
Jan. 6, 1948
330,148
$372.00
Feb. 7, 1948
330,990
372.00
Mar. 8, 1948
331,496
372.00
Apr. 10, 1948
332,079
372.00
May 6, 1948
332,547
372.00
June 4, 1948
332,980
383.00
July 8, 1948
333,515
383.00
Aug. 14, 1948
334,114
405.00
Sept. 10, 1948
334,713
405.00
Oct. 8, 1948
335,401
405.00
Dec. 7, 1948
336,648
405.00
Dec. 30, 1948 [2]
377,033
405.00 These checks were in payment of Caywood's salary. A deposit slip dated February 5, 1949, lists a check in the amount of $405.00 identified by the numbers "15-51". This entry concerns another salary check received by Caywood from the United States. On their income tax return for the taxable year beginning March 1, 1948, and ending February 28, 1949, petitioners indicate that the wage received by Caywood in connection with his job as field secretary was $5,198.52. The return sets forth the figure $514.52 as the total amount of income tax withheld from *109 that wage. On a deposit slip dated November 8, 1948, for petitioners' commercial account at the Coolidge bank there is an entry representing a check in the amount of $405.00. To the left of the dollar notation appear the words "Texas check". The entry on this deposit slip concerns one of the checks received by Caywood as salary in connection with his employment as field secretary. The amount of this check is reflected on petitioners' income tax return. In the "General Journal" of Pioneer, under the date July 31, 1948, there is an entry indicating a loan payable to Caywood in the amount of $2,500. A similar entry alongside the same date is recorded in the liabilities section of Pioneer's ledger. Respondent determined that these entries represent a loan made by petitioners with money which they had received as income, but which they failed to report on their income tax returns. Respondent increased petitioners' income on account of such entries by $2,500. On July 31, 1948, a $500 item was charged against petitioners' commercial account at the Coolidge bank. A $2,000 item was charged against that account on August 12, 1948. Petitioners filed their income tax return for this taxable *110 year on May 5, 1949; their reported gross income was $11,855.12. Petitioners did not file a false and fraudulent income tax return with intent to evade tax for the taxable year ending February 28, 1949. Taxable year ending February 28, 1950. Petitioners received $3,000 from Santa Rita which they failed to report on their income tax returns. This amount was income to them. Petitioners had unreported partnership income from Pioneer in the amount of $1,614.06. Respondent included an additional $1,325, allegedly received by petitioners from Pioneer in connection with three war surplus property transactions, in petitioners' income. The first transaction concerned the receipt by Caywood of $100 on March 8, 1949. The second concerns a check in the amount of $725 dated May 21, 1949, and drawn by Pioneer to the order of cash. This check bears Cathryn's endorsement. The third transaction involves $500 received by Caywood on October 31, 1949. These amounts did not constitute taxable income to petitioners. The first and third transactions represented reimbursement of funds previously advanced by Caywood. The second transaction involved merely the cashing of a check for Pioneer to enable *111 it to bid for surplus property. Respondent determined that certain entries on bank deposit slips for petitioners' bank accounts represent income which petitioners failed to report on their income tax returns. Respondent included the sum of these entries in petitioners' income. There are only two entries still at issue - a deposit of a check in the amount of $193.39 on March 8, 1949 in petitioners' commercial account at the Coolidge bank, and a deposit of $300 in currency on April 29, 1949 in petitioners' commercial account at the home office of the Valley National Bank in Phoenix, Arizona. The deposit on March 8, 1949 was of a paycheck which petitioners had cashed on behalf of their garbage man. The other deposit was of cash left from Caywood's salary. These deposits did not represent unreported income to petitioners. Among petitioners' expenditures during this taxable year were the following: Amount
Date
$ 153.60
July 2, 1949
153.60
October 4, 1949
4,000.00
January 26, 1950
155.20
February 8, 1950 Respondent determined that these expenditures had their source in income that petitioners failed to report on their income tax returns. Respondent included the *112 amount of these expenditures in petitioners' income. On June 8, 1949, Cathryn withdrew $2,000 from petitioners' commercial account at the home office of the Valley National Bank. The expenditure of $153.60 on July 2, 1949, was made from the funds withdrawn on June 8. The expenditure of $153.60 on October 4, 1949, was made out of funds withdrawn on that day from petitioners' commercial account at the home office of the Valley National Bank. The two expenditures of $153.60 each and the expenditure of $155.20 were not made out of unreported income. Petitioners filed their income tax returns for this taxable year on April 10, 1950. Their reported gross income was $14,323.72. No part of the deficiency for the taxable year ending February 28, 1950, is due to petitioners' fraud. Taxable year ending February 28, 1951. During January and February 1951, Tompkins paid Caywood approximately $11,000 in connection with three transactions involving war surplus property. This money was income to petitioners which they failed to report on their income tax returns. Caywood received the following additional amounts of income as a result of transactions involving war surplus vehicles: Amount
Date
$ 300
May 25, 1950
3,500
June 10, 1950
200
June 17, 1950
650
February 14, 1951
*113 Petitioners' income tax returns do not reflect these receipts. Respondent determined that the following amounts, deposited in petitioners' commercial account at the home office of the Valley National Bank in Phoenix, Arizona, were income to petitioners which they failed to report on their income tax returns: Amount
Date
$700.00 - currency
April 14, 1950
500.00 - currency
June 3, 1950
150.00 - check
December 27, 1950
During 1950, but prior to the $700 deposit on April 14, 1950, Tompkins paid petitioners a total of $4,061.57. The $700 deposit was of money paid to petitioners by Tompkins, and it is reported on their second income tax return. The deposits of June 3 and December 27, 1950, were of amounts paid to petitioners by debtors. These amounts were repayments of principal and were not income to petitioners. Petitioners made the following outlays, among others, during this taxable year: Amount
Date
$2,515
April 28, 1950
1,950
June 24, 1950
2,000
October 21, 1950
2,332
January 11, 1951 Respondent concluded that these outlays had their source in unreported income and included the above amounts in petitioners' income. These outlays *114 had their source in income that was reported or otherwise determined in these findings. During the taxable year petitioners suffered a loss from theft in the amount of $230 when a money clip was stolen from Caywood's hotel room in El Paso, Texas. On July 31, 1948, Pioneer purchased certain war surplus facilities which were usable for cold storage purposes. These facilities included a small ice manufacturing plant. The firm attempted to interest Mexican shippers of fish and shrimp in using the facilities for storage purposes. Pioneer filed an "Application For License to Engage in Business" with the State Tax Commission of the State of Arizona. The application is dated February 21, 1949, and states that the nature of the business of the applicant is "Wholesale & Retail War Surplus - Cold Storage Facilities". Pioneer did not operate these facilities, nor was it able to rent them. On November 30, 1949 the facilities were sold. The facilities were not held by Pioneer primarily for sale to customers in the ordinary course of business. Caywood's distributive share of the profits on the sale was $1,593.75. Petitioners filed false and fraudulent income tax returns with intent to evade *115 tax and part of the deficiency for the taxable year ending February 28, 1951, is due to petitioners' fraud with intent to evade tax. Opinion RAUM, Judge: The Commissioner's determination for the three fiscal years ending February 28, 1949-1951, places in issue not only the basic liability for each of the years but also additions to tax for fraud under Section 293(b) as well as additions to tax pursuant to Section 294(d), Internal Revenue Code of 1939. Although the petition appears to contest the Section 294(d) additions, the issue was not raised at the hearing nor discussed in petitioners' brief. In the circumstances it must be deemed to have been abandoned by them. However, they challenge the determination as to basic liability and the additions for fraud; moreover, they contend that the first two years are barred by limitations. The deficiency notice was sent more than three years (but less than five years) after the filing of the return for each of the first two years, and those years are accordingly outlawed unless fraud is proved or unless there was an omission from gross income that was in excess of 25 per cent of the gross income shown in the return. Sections 275(a) and *116 (c), 276(a), Internal Revenue Code of 1939. The burden of proof to show that either Section 275(c) or Section 276(a) is applicable is upon the respondent. Iverson's Est. v. Commissioner 255 Fed. (2d) 1 (C.A. 8), May 9, 1958; Wood v. Commissioner, 245 Fed. (2d) 888, 893 (C.A. 5); Jack Rose, 24 T.C. 755, 767; Section 1112, Internal Revenue Code of 1939. The Commissioner's determinations of basic liability were founded primarily upon a number of items and classes of items spelled out in a revenue agent's report which was introduced in evidence and which (together with two other exhibits) furnished the framework for the trial of this case. A number of the items are no longer in issue as a result of concessions made by the parties. As to the remaining items the burden was on the petitioners, apart from the fraud or Section 275(c) issues. The Commissioner not only charged petitioners with certain specific items of allegedly unreported income but he also treated certain unexplained bank deposits and certain expenditures from so-called unexplained sources as having been made from unreported income. Since there is obviously a possibility of duplication *117 among these categories, a most careful study of the evidence is required. Taxable year ending February 28, 1949. For the taxable year ending February 28, 1949, the Commissioner determined the deficiency by increasing income in the amount of $20,293.21 and by denying deductions in the amount of $4,218.71 for lack of substantiation. For reasons more fully set out hereinafter we hold that assessment is barred as to this year since we have not been able to find either fraud or the requisite 25 per cent omission of gross income under Section 275(c). A brief review of the items upon which the determination of deficiency rests is appropriate. They are as follows: The Commissioner included in gross income an item of $6,000, the alleged value of six shares of stock of the Santa Rita Investment Company, Inc., which Caywood received upon the organization of that corporation. We have found, however, that such stock had no market value at that time. Upon repayment of a $3,000 loan to Cathryn the debtor gave her a $3,300 check. The difference represented a bonus or interest which petitioners failed to report. Petitioners did not include in their gross income certain reimbursements for *118 travel expense. They now agree by stipulation that this item, in the amount of $894.97, was income to them. The Commissioner charged petitioners with income from the disposition of four pieces of surplus property in the amounts of $300, $250, $200 and $1,500. As a result of our findings, the $1,500 item (sale to Shawver Brothers) must be reduced to $400, and we may reasonably conclude on the record, although the evidence is not very strong, that the other three items represent taxable income to petitioners. Accordingly, these four items, in the aggregate, constitute $1,150 of unreported income. The remaining items of allegedly unreported income for this taxable year are founded simply upon certain unexplained deposits and expenditures from so-called unexplained sources, in the aggregate amounts of $8,043.65 and $2,804.60, respectively. Concessions by respondent have eliminated some of these items, and as to the others he presented no proof that they represented income to petitioners. Petitioners endeavored to explain these items at the trial. Their explanation was satisfactory as to some of them. But even where their explanation was weak, that circumstance cannot aid respondent *119 in carrying his own burden of proof as to fraud or under Section 275(c). As to the $4,218.71 deduction which respondent disallowed for lack of substantiation, the parties have stipulated that $3,164.10 is allowable. Bearing in mind that the burden of proof is upon the Commissioner in respect of fraud and the Section 275(c) issue, it is apparent that the only items of unreported income proved for this year are $300 interest, $894.97 reimbursed travel expenses, and $1,150 from sales of surplus property. The only other item properly entering into the deficiency was a stipulated overstatement of travel expense in the net amount of $1,054.61. Since petitioners reported gross income of $11,855.12 for this taxable year, it is apparent that the Government has failed to prove the necessary omission of 25 per cent under Section 275(c), and the items shown to have been properly taken into account in the determination of the deficiency were of such character or the proof with respect to them was such that we could not find fraud convincingly proved on this record. Taxable year ending February 28, 1950. In determining the deficiency for the year ending February 28, 1950, the Commissioner *120 charged petitioners with $14,426.41 of unreported income, and he disallowed deductions in the amount of $1,852.45 for lack of substantiation. This year is likewise barred unless fraud is proved or unless there is the requisite omission of gross income of at least 25 per cent of the amount reported, namely, $14,323.72. We are satisfied that there was an omission of more than 25 per cent, and that this year is therefore not barred; however, we cannot find that fraud has been proved as to this year. Concessions as to three of the items alone bring the amount of unreported income to a level in excess of the statutory 25 per cent. First, petitioners admit the receipt of a $3,000 distribution from Santa Rita, but they claim offsetting deductions in the sum of $1,627.10 allegedly representing amounts previously expended by them as organization expenses on behalf of Santa Rita. The proof as to these offsetting deductions was weak and unpersuasive. Secondly, they admit additional income in the amount of $1,614.06 as a result of certain adjustments which the Commissioner had made with respect to Pioneer's return. Caywood was a partner with a 25 per cent interest in Pioneer and the $1,614.06 *121 items represents one-fourth of that adjustment. Thirdly, the stipulation of the parties states that Caywood received $1,622.15 as reimbursement of travel expenses which was income to petitioners and not reported by them. Three other series of items were involved in the determination of the deficiency for this year. (i) The Commissioner included $1,325 in gross income, allegedly representing income received from Pioneer in connection with three war surplus property transactions. We have found otherwise. Two of the transactions represented reimbursement of funds previously advanced by Caywood, and the third merely an accommodation endorsement on a check of Pioneer by Cathryn. (ii) The Commissioner included in income $2,402.50 of unexplained deposits and $4,462.70 as expenditures from unexplained sources. As to the unexplained deposits, the Commissioner has conceded four of the six items involved. The remaining two deposits were satisfactorily explained to us at the trial, and we are reasonably convinced on the evidence that they did not represent income to petitioners. One was a paycheck in the amount of $193.39 which petitioner cashed on behalf of their garbage man and then deposited *122 in their own account. The other item was a deposit of $300 in currency, and the evidence shows that this represented merely residual cash from a salary check or from salary checks that had been cashed, and which had been reported. As to the expenditures from unexplained sources, four items are in controversy. Three of them, each somewhat over $150, represented mortgage payments, and we are satisfied on the evidence that they did not have their source in unreported income. The fourth item, in the amount of $4,000, consists of two cashier's checks of $2,000 each. The evidence here was confusing and wholly unsatisfactory. We must hold that petitioners have failed to carry their burden of proof with respect to this item, and that it must therefore be included in their gross income. (iii) In their return petitioners claimed a deduction of $1,852.45 as travel expense, which the Commissioner disallowed in its entirety for lack of substantiation. By stipulation the Commissioner now concedes that $1,226.23 thereof is deductible and petitioners concede that the remaining $626.22 is to be disallowed. Here, as in the case of the preceding year, we cannot find that the Commissioner has proved *123 fraud by clear and convincing evidence. The items involved were of such character and the proof presented was such as to render the presence of fraud too doubtful to justify the finding sought by the Commissioner. Taxable year ending February 28, 1951. Petitioners filed two returns for this taxable year, one on March 28, 1951, and the second on May 14, 1951, both of them timely. The deficiency notice was sent within the three-year period, and there is therefore no statute of limitations issue as to this year. However, the Commissioner's determination includes an addition to tax for fraud, and the burden of proof is upon him as to this issue. The burden as to the basic deficiency rests upon the petitioners. The determination as to this taxable year differs in one critical respect from those involving the two preceding years, namely, that it involves income from surplus property transactions in conjunction with Harry Tompkins. The evidence is strong that petitioner and Tompkins carried out a scheme in which surplus property was illegally diverted and made available to Tompkins by Caywood, that Tompkins reconditioned and sold the property and then paid a portion of the sales price *124 to Caywood. The first return filed by petitioners for this year included no amount whatever from the Tompkins transactions. However, the evidence shows that in the spring of 1951 Tompkins had apparently become apprehensive about his own income tax return which had been filed for the calendar year 1950; that he was planning to file an amended return for that year showing income from these transactions, but was anxious that Caywood account for the moneys which he had paid over to Caywood; and that he pressured Caywood to acknowledge receipt of $10,011.57 from him during 1950. It was against this background that petitioners filed their second return for 1951. The $10,011.57 was listed on that return simply as "Commissions" and not otherwise identified. We have no doubt on this record that petitioners' original return for this year was false and fraudulent. Petitioners were fully aware that they had not reported the profits from the Tompkins transactions. However, since the second return was filed within the period that a timely return could have been filed in the first instance, the respondent apparently concedes that the addition for fraud is properly to be determined on the basis *125 of the second return. Nevertheless, we are equally convinced on this record that the second return was also fraudulent. The additional income of $10,011.57 included in the second return represented profits from the Tompkins transactions realized by petitioners during the calendar year 1950. Tompkins was on a calendar year basis, and when he was about to file his amended return for that year the focus of the discussions between him and Caywood was the allocation of the 1950 calendar year income. The $10,011.57 represented Caywood's alleged share up to the end of December 1950. But petitioners were on a fiscal year ending February 28, and we are fully satisfied on the evidence that Caywood received $11,000 more than Tompkins during January and February of 1951. Petitioners corrected their return only to the extent necessary to meet the immediate demands of Tompkins. We have no doubt that, even when filing their second return, petitioners deliberately and falsely omitted this large amount of income received during January and February of 1951. The record fully supports our finding of fraud as to this year. Apart from the circumstances outlined above, the evidence shows not only the *126 conviction of Caywood and Tompkins with respect to their surplus property dealings, but also Caywood's bald lies to a revenue agent who interrogated him with respect to these matters. He denied that he ever received any money from Tompkins, that he was connected with the surplus property in question, or that he had any transactions "of any kind" with Tompkins. The respondent has carried his burden of proving that at least a portion of the deficiency for this year was due to fraud with intent to evade tax. Some of the items in controversy for this year have been agreed upon by the parties and they will be taken into account accordingly in the decision to be entered under Rule 50. Certain other items remain to be disposed of. Included in respondent's determination were four items of income aggregating $4,650 with respect to four other transactions involving surplus property. Petitioners introduced no evidence relating to these transactions; accordingly, we must uphold respondent as to these items. Also included in the income attributed to petitioners by the Commissioner were four unexplained bank deposits in the aggregate amount of $1,800. The Government has conceded one of these *127 items, in the amount of $450, and petitioners offered evidence in explanation of the other three in the amounts of $150, $700, and $500. We are reasonably satisfied that these deposits were not made from unreported income and have so found. Respondent's determination also included in petitioners' gross income four items of expenditure in the amounts of $2,000, $1,950, $2,515 and $2,332, on the ground that they had their source in unreported income. Petitioners attempted to chart the inflow of their funds in order to explain the source of these outlays. Taking into account that evidence and also our findings of additional income in connection with the surplus property and Tompkins transactions, we are reasonably satisfied that these outlays had their origin in income that was reported or in income otherwise determined in accordance with our findings. On this issue we sustain petitioners. Petitioners raise an issue relating to the Commissioner's disallowance of a $230 theft loss with respect to a money clip allegedly stolen from Caywood's hotel room in El Paso, Texas. We are satisfied on the evidence that such loss in fact occurred and have so found as a fact. A final matter calling *128 for disposition relates to Caywood's share of partnership income from the sale of certain cold storage facilities by Pioneer. The amount involved, $1,593.75, is not in dispute. The only question is whether the proceeds were realized upon the sale of a capital asset. The question is essentially one of fact. Pioneer was admittedly engaged in the business of buying and selling war surplus property. The facts with respect to these facilities, however, are different. Pioneer's intention as to these facilities was to operate and lease them, and in fact it applied for a license from the State of Arizona authorizing it to engage in such business. It was only after the projected enterprises proved not to be feasible that the facilities were liquidated. We hold that they were capital assets and were not held for sale to customers in the ordinary course of trade or business. Decision will be entered under Rule 50. Footnotes
1. The indictment, Exhibit LL, was not admitted in evidence herein when first offered. Later, however, at page 418 of the Transcript, it was admitted, but the reporter failed to note such admission and in fact erroneously referred to it as "Exhibit L". The clerk, in accordance with the directions given by the trial judge at that time, stamped the exhibit as admitted.↩
2. Although the deposit slip is dated December 30, the bank records indicate the transaction took place on December 28, 1948.↩